Irwin RAVIN, Petitioner,

v.

STATE of Alaska, Respondent.

No. 2135.

Supreme Court of Alaska.

May 27, 1975.

As Amended May 28, 1975.

R. Collin Middleton and Robert H. Wagstaff, Anchorage, for petitioner.

Stephen G. Dunning, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for respondent.

OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

RABINOWITZ, Chief Justice.

The constitutionality of Alaska's statute prohibiting possession of marijuana is put in issue in this case. Petitioner Ravin was arrested on December 11, 1972 and charged with violating AS 17.12.010.[1] Before trial Ravin attacked the constitutionality of AS 17.12.010 by a motion to dismiss in which he asserted that the State had violated his right of privacy under both the federal and Alaska constitutions, and further violated the equal protection provisions of the state and federal constitutions. Lengthy hearings on the questions were held before District Court Judge Dorothy D. Tyner, at which testimony from several expert witnesses was received. Ravin's motion to dismiss was denied by Judge Tyner. The superior court then granted review and after affirmance by the superior court, we, in turn, granted Ravin's petition for review from the superior court's affirmance.

Here Ravin raises two basic claims: first, that there is no legitimate state interest in prohibiting possession of marijuana by adults for personal use, in view of the right to privacy; and secondly, that the statutory classification of marijuana as a dangerous drug, while use of alcohol and tobacco is not prohibited, denies

1. AS 17.12.010 provides:
Except as otherwise provided in this chapter, it is unlawful for a person to manufacture, compound, counterfeit, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, a depressant, hallucinogenic or stimulant drug.
AS 17.12.150 defines "depressant, hallucinogenic, or stimulant drug" to include all parts of the plant *Cannabis Sativa L.*

him due process and equal protection of law.[2]

We first address petitioner's contentions that his constitutionally protected right to privacy compels the conclusion that the State of Alaska is prohibited from penalizing the private possession and use of marijuana. Ravin's basic thesis is that there exists under the federal and Alaska constitutions a fundamental right to privacy, the scope of which is sufficiently broad to encompass and protect the possession of marijuana for personal use. Given this fundamental constitutional right, the State would then have the burden of demonstrating a compelling state interest in prohibiting possession of marijuana. In light of these controlling principles, petitioner argues that the evidence submitted below by both sides demonstrates that marijuana is a relatively innocuous substance, at least as compared with other less-restricted substances, and that nothing even approaching a compelling state interest was proven by the State.

Ravin's arguments necessitate a close examination of the contours of the asserted right to privacy and the scope of this court's review of the legislature's determination to criminalize possession of marijuana.

■ We have previously stated the tests to be applied when a claim is made that state action encroaches upon an individual's constitutional rights. In *Breese v. Smith,* 501 P.2d 159 (Alaska 1972), we had before us a school hairlength regulation which encroached on what we determined to be the individual's fundamental right to determine his own personal appearance. There we stated:

> Once a fundamental right under the constitution of Alaska has been shown to be involved and it has been further shown that this constitutionally protected right has been impaired by governmental action, then the government must come forward and meet its substantial burden of establishing that the abridgement in question was justified by a compelling governmental interest.[3]

This standard is familiar federal law as well. As stated by the United States Supreme Court:

> Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.[4]

The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy."[5]

■ When, on the other hand, governmental action interferes with an individual's freedom in an area which is not characterized as fundamental, a less stringent test is ordinarily applied. In such cases our task is to determine whether the legislative enactment has a reasonable relationship to a legitimate governmental purpose.[6] Under this latter test, which is sometimes referred to as the "rational basis" test, the State

---

2. In his briefs before this court, Ravin also attempts to raise the issue of cruel and unusual punishment in the application of AS 17.12.010 to possession of marijuana for personal use. Because this issue was not raised below or in the petition for review to this court, we decline to consider the issue in this proceeding. *See* Appellate Rule 24(c). *Cf.* Moran v. Holman, 501 P.2d 769, 770 n. 1 (Alaska 1972).

3. 501 P.2d at 171. *See* State v. Wylie, 516 P.2d 142 (Alaska 1973); State v. Van Dort, 502 P.2d 453 (Alaska 1972); Gray v. State, 525 P.2d 524, 527 (Alaska 1974); Gilbert v. State, 526 P.2d 1131, 1133 (Alaska 1974); State v. Adams, 522 P.2d 1125 (Alaska 1974).

4. Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct 412, 417, 4 L.Ed.2d 480, 486 (1960). *See* Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147, 178 (1973).

5. McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222, 231 (1964), quoted in the concurrence of Mr. Justice Goldberg in Griswold v. Connecticut, 381 U.S. 479, 497, 85 S.Ct. 1678, 14 L.Ed.2d 510, 523 (1965).

6. *See* Concerned Citizens v. Kenai Peninsula Borough, 527 P.2d 447, 452 (Alaska 1974); Mobil Oil Corp v. Local Boundary Comm'n, 518 P.2d 92, 101 (Alaska 1974); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L. Ed. 1042 (1923).

need only demonstrate the existence of facts which can serve as a rational basis for belief that the measure would properly serve the public interest.

In our recent opinion in *Lynden Transport, Inc. v. State,* 532 P.2d 700 (Alaska 1975), we recognized the existence of considerable dissatisfaction with the fundamental right-compelling state interest test. There we said:

It has been suggested that there is mounting discontent with the rigid two-tier formulation of the equal protection doctrine, and that the United States Supreme Court is prepared to use the clause more rigorously to invalidate legislation without expansion of "fundamental rights" or "suspect" categories and the concomitant resort to the "strict scrutiny" tests. We are in agreement with the view that the Supreme Court's recent equal protection decisions have shown a tendency towards less speculative, less deferential, more intensified means-to-end inquiry when it is applying the traditional rational basis test and we approve of this development. *See* Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972). *See, e. g.,* James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L. Ed.2d 435 (1972); Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); Eisenstadt v. Baird, 405 U. S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

■ This court has previously applied a test different from the rigid two-tier formulation to state regulations. In *State v. Wylie,*[7] we tested durational residency requirements for state employment by both the compelling state interest test and a test which examined whether the means chosen suitably furthered an appropriate governmental interest.[8] It is appropriate in this case to resolve Ravin's privacy claims by determining whether there is a proper governmental interest in imposing restrictions on marijuana use and whether the means chosen bear a substantial relationship to the legislative purpose. If governmental restrictions interfere with the individual's right to privacy, we will require that the relationship between means and ends be not merely reasonable but close and substantial.

Thus, our undertaking is two-fold: we must first determine the nature of Ravin's rights, if any, abridged by AS 17.12.010, and, if any rights have been infringed upon, then resolve the further question as to whether the statutory impingement is justified.

As we have mentioned, Ravin's argument that he has a fundamental right to possess marijuana for personal use rests on both federal and state law, and centers on what may broadly be called the right to privacy. This "right" is increasingly the subject of litigation and commentary and is still a developing legal concept.[9]

In Ravin's view, the right to privacy involved here is an autonomous right which gains special significance when its situs is found in a specially protected area, such as the home. Ravin begins his privacy argument by citation of and reliance upon *Griswold v. Connecticut,*[10] in which the Supreme Court of the United States struck down as unconstitutional a state statute effectively barring the dispensation of birth control information to married persons. Writing for five members of the Court, Mr. Justice Douglas noted that rights protected by the Constitution are not limited to those specifically enumerated in the

7. 516 P.2d 142 (Alaska 1973).

8. *Id.* at n. 16.

9. The right to privacy was recently made explicit in Alaska by an amendment to the state constitution. Alaska Const. Art. I, § 22.

10. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Constitution. In order to secure the enumerated rights, certain peripheral rights must be recognized. In other words, the "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance."[11] Certain of these penumbral rights create "zones of privacy", for example, First Amendment rights of association, Third and Fourth Amendment rights pertaining to the security of the home, and the Fifth Amendment right against self-incrimination. The Supreme Court of the United States then proceeded to find a right to privacy in marriage which antedates the Bill of Rights and yet lies within the zone of privacy created by several fundamental constitutional guarantees. It was left unclear whether this particular right to privacy exists independently, or comes into being only because of its connection with fundamental enumerated rights.

The next important Supreme Court opinion regarding privacy is *Stanley v. Georgia*,[12] in which a state conviction for possession of obscene matter was overturned as violative of the First and Fourteenth Amendments. The Supreme Court had previously held that obscenity is not protected by the First Amendment.[13] But in *Stanley* the Count made a distinction between commercial distribution of obscene matter and the private enjoyment of it at home. The Constitution, it said, protects the fundamental right to receive information and ideas, regardless of their worth. Moreover, the Supreme Court said,

> . . . in the context of this case - a prosecution for mere possession of printed or filmed matter in the privacy of a

person's own home—that right takes on an added dimension. For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.[14]

The Supreme Court concluded that the First Amendment means a state has no business telling a man, sitting alone in his own home, what books he may read or what films he may watch. The Court took care to limit its holding to mere possession of obscene materials by the individual in his own home. It noted that it did not intend to restrict the power of the state or federal government to make illegal the possession of items such as narcotics, firearms, or stolen goods.

The Stanley holding was subsequently refined by a series of cases handed down in 1973. In *Paris Adult Theatre I v. Slaton*,[15] the Supreme Court rejected the claim of a theater owner that his showing of allegedly obscene films was protected by *Stanley* because his films were shown only to consenting adults. The Court explicitly rejected the comparison of a theater to a home and found a legitimate state interest in regulating the use of obscene matter in local commerce and places of public accommodation. It apparently found no fundamental right involved in viewing obscene matter under these conditions, for it noted that the right to privacy guaranteed by the Fourteenth Amendment extends only to fundamental rights. The protection offered by *Stanely*, the Supreme Court stated, was restricted to the home, and it explicitly refused to say that all activities occurring between consenting adults were beyond the reach of the government.[16]

11. 381 U.S. at 484, 85 S.Ct. at 1681, 14 L. Ed.2d at 514.

12. 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

13. *See* Roth v. U. S., 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

14. 394 U.S. at 564, 89 S.Ct. at 1247, 22 L. Ed.2d at 549.

15. 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). *See also* United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973) ; United States v. 12 200–Ft. Reels, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

16. In a companion case, *United States v. Orito*, 413 U.S. 139 93 S.Ct. 2674, 37 L.Ed. 2d 513 (1973), the Supreme Court observed

These Supreme Court cases indicate to us that the federal right to privacy arises only in connection with other fundamental rights, such as the grouping of rights which involve the home. And even in connection with the penumbra of home-related rights, the right of privacy in the sense of immunity from prosecution is absolute only when the private activity will not endanger or harm the general public.

The view is confirmed by the Supreme Court's abortion decision, *Roe v. Wade*.[17] There appellant claimed that her right to decide for herself concerning abortion fell within the ambit of a right to privacy flowing from the federal Bill of Rights. The Court's decision in her favor makes clear that only personal rights which can be deemed "fundamental" or "implicit in the concept of ordered liberty" are protected by the right to privacy. The Supreme Court found this right "broad enough to encompass a woman's decision whether or not to terminate her pregnancy," but it rejected the idea that a woman's right to decide is absolute. At some point, the state's interest in safeguarding health, maintaining medical standards, and protecting potential life becomes sufficiently compelling to sustain regulations. One does not, the Supreme Court said, have an unlimited right to do with one's body as one pleases.

The right to privacy which the Court found in *Roe* is closely akin to that in *Griswold*; in both cases the zone of privacy involves the area of the family and procreation,[18] more particularly, a right of personal autonomy in relation to choices affecting an individual's personal life.

In Alaska this court has dealt with the concept of privacy on only a few occasions. One of the most significant decisions in this area is *Breese v. Smith*,[19] where we considered the applicability of the guarantee of "life, liberty, the pursuit of happiness" found in the Alaska Constitution,[20] to a school hairlength regulation. Noting that hairstyles are a highly personal matter in which the individual is traditionally autonomous, we concluded that governmental control of personal appearance would be antithetical to the concept of personal liberty under Alaska's constitution. Since the student would be forced to choose between controlling his own personal appearance and asserting his right to an education if the regulations were upheld, we concluded that the constitutional language quoted above embodied an affirmative grant of liberty to public school students to choose their own hairstyles, for "at the core of [the concept of liberty] is the notion of total personal immunity from government control: the right 'to be let alone.' "[21] That right is not absolute, however; we also noted that this "liberty" must yield where it "intrude[s] upon the freedom of others."[22]

Subsequent to our decision in *Breese,* a right to privacy amendment was added to the Alaska Constitution. Article I, section 22 reads:

> The right of the people to privacy is recognized and shall not be infringed. The

---

that the *Stanley* right to possess obscene matter in the home is limited to the home and does not create a right to transport, receive, or distribute the matter. The Supreme Court further said that it is not true that a zone of constitutionally protected privacy follows such materials when they are moved outside the home. *See* United States v. 12 200-Ft. Reels, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed. 2d 500 (1973).

17. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

18. *Cf.* Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) where the Supreme Court said in part:

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

19. 501 P.2d 159 (Alaska 1972).

20. Alaska Const. Art. I, § 1.

21. 501 P.2d at 168.

22. 501 P.2d at 170, quoting Bishop v. Colaw, 450 F.2d 1069, 1077 (8th Cir. 1971).

legislature shall implement this section. The effect of this amendment is to place privacy among the specifically enumerated rights in Alaska's constitution. But this fact alone does not, in and of itself, yield answers concerning what scope should be accorded to this right of privacy.[23] We have suggested that the right to privacy may afford less than absolute protection to "the ingestion of food, beverages or other substances".[24] For any such protection must be limited by the legitimate needs of the State to protect the health and welfare of its citizens.[25]

Although a number of other jurisdictions have considered the privacy issue as it applies to marijuana prosecutions, they provide little help in defining the scope of article I, section 22 of Alaska's constitution. In Hawaii, whose constitution also contains an express guarantee of the right to privacy,[26] the supreme court has faced a similar issue. In *State v. Kantner*,[27] the Supreme Court of Hawaii upheld a conviction for possession of marijuana by a 3–2 vote, with one member of the majority concurring only because he thought the constitutional issue had not been properly raised. A majority rejected the claim that application of the statute violated guarantees of equal protection and due process, and two members of the court rejected the

claim of violation of "fundamental liberty" based on *Griswold*. In dissent, Justice Levinson emphasized the guarantees of privacy and personal autonomy which he found in both the Hawaii Constitution and the due process clause of the Fourteenth Amendment to the United States Constitution. He found that the right to privacy "guarantees to the individual the full measure of control over his own personality consistent with the security of himself and others."[28] The experiences generated by use of marijuana are mental in nature, he wrote, and thus among the most personal and private experiences possible. So long as conduct does not produce detrimental results, the right of privacy protects the individual's conduct designed to affect these inner areas of the personality. The state failed to show, he found, any harm to the user or others from the private, personal use of marijuana, and so the statute infringed on the right to personal autonomy.

In a Michigan case the same year, a conviction for possession of marijuana was overturned by a unanimous court, though for a variety of reasons. One of the justices in *People v. Sinclair*,[29] Justice T. G. Kavanagh, rested his opinion squarely on the basic right of the individual to be free from government intrusions. He found the marijuana possession statute to be "an

23. For a discussion of the origins and scope of a similar constitutional guarantee of privacy, in the Hawaii Constitution, Art. I, § 5, see *State v. Kantner*, 53 Haw. 327, 493 P. 2d 306 (1972), particularly n. 4 in the dissent of Justice Levinson at p. 314. This court has, in the area of searches and seizures, attempted to define the right of privacy. *See, e.g.,* Erickson v. State, 507 P.2d 508 (Alaska 1973) ; Mattern v. State, 500 P.2d 228 (Alaska 1972) ; Davis v. State, 499 P.2d 1025 (Alaska 1972) ; Ellison v. State, 383 P.2d 716 (Alaska 1963) ; Rubey v. City of Fairbanks, 456 P.2d 470 (Alaska 1969) ; Sleziak v. State, 454 P.2d 252 (Alaska 1969).

24. Gray v. State, 525 P.2d 524, 528 (Alaska 1974). In *Gray* we said:
 There is no available recorded history of this amendment, but clearly it shields the ingestion of food, beverages or other substances. But the right of privacy is not

absolute. Where a compelling state interest is shown, the right may be held to be subordinate to express constitutional powers such as the authorization of the legislature to promote and protect public health and provide for the general welfare.

25. *Id.* If the State were required, for instance, to carry the extremely heavy burden of showing a compelling state interest before it could regulate the purity of foodstuffs and medicines, the result would be a practical inability to protect the public from health threats which consumers could neither know about nor protect themselves against.

26. Hawaii Const. Art. I, § 5.

27. 53 Haw. 327, 493 P.2d 306 (1972).

28. 493 P.2d at 315.

29. 387 Mich. 91, 194 N.W.2d 878 (1972).

impermissible intrusion on the fundamental rights to liberty and the pursuit of happiness, and is an unwarranted interference with the right to possess and use private property." [30] He noted the basic freedom of the individual to be free to do as he pleases so long as his actions do not interfere with the rights of his neighbor or of society. ". . . 'Big Brother' cannot, in the name of *Public* health, dictate to anyone what he can eat or drink or smoke in the *privacy* of his own home." [31]

Generally, however, privacy as a constitutional defense in marijuana cases has not met with much favor. It was rejected, for instance, by the Massachusetts Supreme Judicial Court in *Commonwealth v. Leis*,[32] where the court held that there was no constitutional right to smoke marijuana, that smoking marijuana was not fundamental to the American scheme of justice or necessary to a regime of ordered liberty, and that smoking marijuana was not locatable in any "zone of privacy". Furthermore, the court said, there is no constitutional right to become intoxicated.[33]

■ Assuming this court were to continue to utilize the fundamental right-compelling state interest test in resolving privacy issues under article I, section 22 of Alaska's constitution, we would conclude that there is not a fundamental constitutional right to possess or ingest marijuana in Alaska. For in our view, the right to privacy amendment to the Alaska Constitution cannot be read so as to make the possession or ingestion of marijuana itself a fundamental right. Nor can we conclude that such a fundamental right is shown by virtue of the analysis we employed in *Breese*. In that case, the student's tradi-

tional liberty pertaining to autonomy in personal appearance was threatened in such a way that his constitutionally guaranteed right to an education was jeopardized. Hairstyle, as emphasized in *Breese,* is a highly personal matter involving the individual and his body. In this sense this aspect of liberty-privacy is akin to the significantly personal areas at stake in *Griswold* and *Eisenstadt v. Baird.* Few would believe they have been deprived of something of critical importance if deprived of marijuana, though they would if stripped of control over their personal appearance. And, as mentioned previously, a discrete federal right of privacy separate from the penumbras of specifically enumerated constitutional rights has not as yet been articulated by the Supreme Court of the United States. Therefore, if we were employing our former test, we would hold that there is no fundamental right, either under the Alaska or federal constitutions, either to possess or ingest marijuana.

The foregoing does not complete our analysis of the right to privacy issues. For in *Gray* we stated that the right of privacy amendment of the Alaska Constitution "clearly it shields the ingestion of food, beverages or other substances", but that this right may be held to be subordinate to public health and welfare measures. Thus, Ravin's right to privacy contentions are not susceptible to disposition solely in terms of answering the question whether there is a general fundamental constitutional right to possess or smoke marijuana. This leads us to a more detailed examination of the right to privacy and the relevancy of where the right is exercised. At one end of the scale of the scope of the right to privacy is possession or ingestion

30. 194 N.W.2d at 896.

31. *Id.*

32. 243 N.E.2d 898 (Mass.1969).

33. The privacy argument has been rejected in several other cases. Miller v. State, 458 S.W.2d 680 (Tex.Crim.App.1970) ; *In re Klor,* 64 Cal.2d 816, 51 Cal.Rptr. 903, 415 P.2d 791 (1966) ; People v. Aguiar, 257 Cal. App.2d 597, 65 Cal.Rptr. 171 (1968) ; United States v. Drotar, 416 F.2d 914 (5th Cir. 1969), *vacated on other grounds,* 402 U.S. 939, 91 S.Ct. 1628, 29 L.Ed.2d 107 (1971) ; Borras v. State, 229 So.2d 244 (Fla.1969) ; Raines v. State, 225 So.2d 330 (Fla.1969). *See* Scott v. United States, 129 U.S.App.D.C. 396, 395 F.2d 619 (1968).

in the individual's home. If there is any area of human activity to which a right to privacy pertains more than any other, it is the home. The importance of the home has been amply demonstrated in constitutional law. Among the enumerated rights in the federal Bill of Rights are the guarantee against quartering of troops in a private house in peacetime (Third Amendment) and the right to be "secure in their . . . houses . . . against unreasonable searches and seizures . . ." (Fourth Amendment). The First Amendment has been held to protect the right to "privacy and freedom of association in the home." [34] The Fifth Amendment has been described as providing protection against all governmental invasions "of the sanctity of a man's home and the privacies of life." [35] The protection of the right to receive birth control information in *Griswold* was predicated on the sanctity of the marriage relationship and the harm to this fundamental area of privacy if police were allowed to "search the sacred precincts of marital bedrooms." [36] And in *Stanley v. Georgia*,[37] the Court emphasized the home as the situs of protected "private activities". The right to receive information and ideas was found in *Stanley* to take on an added dimension precisely because it was a prosecution for possession in the home:

"For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." [38] In a later case, the Supreme Court noted that *Stanley* was not based on the notion that the obscene matter was itself protected by a constitutional penumbra of privacy, but rather was a "reaffirmation that 'a man's home is his castle.' " [39] At the same time the Court noted, "the Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education." [40] And as the Supreme Court pointed out, there exists a "myriad" of activities which may be lawfully conducted within the privacy and confines of the home, but may be prohibited in public.[41]

In Alaska we have also recognized the distinctive nature of the home as a place where the individual's privacy receives special protection. This court has consistently recognized that the home is constitutionally protected from unreasonable searches and seizures, reasoning that the home itself retains a protected status under the Fourth Amendment and Alaska's constitution distinct from that of the occupant's person.[42] The privacy amendment to the Alaska Constitution was intended to give recognition and protection to the

34. Moreno v. United States Dep't of Agriculture, 345 F.Supp. 310, 314 (D.D.C.1972), aff'd, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed. 2d 782 (1973).

35. Boyd v. U. S., 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746, 751 (1886).

36. 381 U.S. at 486, 85 S.Ct. at 1682, 14 L. Ed.2d at 516.

37. 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

38. 394 U.S. at 564, 89 S.Ct. at 1247, 22 L. Ed.2d at 549.

39. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 66, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446, 462 (1973).

40. U. S. v. Orito, 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513, 517 (1973). *See*

U. S. v. 12 200-Ft. Reels, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

41. U. S. v. Orito, 413 U.S. 139, 142–143, 93 S.Ct. 2674, 37 L.Ed.2d 513, 518 (1973).

42. State v. Spietz, 531 P.2d 521 (Alaska 1975); Ferguson v. State, 488 P.2d 1032 (Alaska 1971). *See* cases cited *supra* at n. 21. The home receives special attention in other areas of Alaska's laws, e. g., the homestead exemption in relation to execution sales, AS 09.35.090; the justifiable homicide defense pertaining to the prevention of a felony in the home, AS 11.15.100; and the distinction between burglary in a dwelling house and burglary in other structures, AS 11.20.080–.100.

home. Such a reading is consonant with the character of life in Alaska. Our territory and now state has traditionally been the home of people who prize their individuality and who have chosen to settle or to continue living here in order to achieve a measure of control over their own lifestyles which is now virtually unattainable in many of our sister states.

The home, then, carries with it associations and meanings which make it particularly important as the situs of privacy. Privacy in the home is a fundamental right, under both the federal and Alaska constitutions. We do not mean by this that a person may do anything at anytime as long as the activity takes place within a person's home. There are two important limitations on this facet of the right to privacy. First, we agree with the Supreme Court of the United States, which has strictly limited the *Stanley* guarantee to possession for purely private, noncommercial use in the home. And secondly, we think this right must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare. No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely. Indeed, one aspect of a private matter is that it *is* private, that is, that it does not adversely affect persons beyond the actor, and hence is none of their business. When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated.

Thus, we conclude that citizens of the State of Alaska have a basic right to privacy in their homes under Alaska's constitution. This right to privacy would encompass the possession and ingestion of substances such as marijuana in a purely personal, non-commercial context in the home unless the state can meet its substantial burden and show that proscription of possession of marijuana in the home is supportable by achievement of a legitimate state interest.

This leads us to the second facet of our inquiry, namely, whether the State has demonstrated sufficient justification for the prohibition of possession of marijuana in general in the interest of public welfare; and further, whether the State has met the greater burden of showing a close and substantial relationship between the public welfare and control of ingestion or possession of marijuana in the home for personal use.

The evidence which was presented at the hearing before the district court consisted primarily of several expert witnesses familiar with various medical and social aspects of marijuana use.[43] Numer-

43. Among the works we have examined in addition to the testimony below are the following: Marihuana: A Signal of Misunderstanding, the First Report of the National Commission on Marihuana and Drug Abuse (March 1972); Drug Use in America: Problem in Perspective, the Second Report of the National Commission on Marihuana and Drug Abuse (March 1973); Drug Use in Anchorage, Alaska, 223 J.Am.Med. Ass'n 657 (1971); G. Nahas, Marihuana: Deceptive Weed (1973); Nahas *et al*, Inhibition of Cellular Mediated Immunity in Marihuana Smokers, 183 Science 419 (1974); L. Grinspoon, Marihuana Reconsidered (1971); Hearings before the U. S. Senate Subcommittee on Internal Security, May 1974; Nahas & Greenwood, The First Report of the National Commission on Marihuana (1972): Signal of Misunderstanding or Exercise in Ambiguity, draft of article to be published in Bulletin of N. Y. Academy of Medicine; Marihuana and Health: Fourth Annual Report to the U. S. Congress from the Secretary of Health, Education, and Welfare (1974); Silverstein & Tessin, Normal Skin Test Responses in Chronic Marihuana Users, 186 Science 740 (1974); Marihuana: The Grass May No Longer Be Greener, 185 Science 683 (1974); Marihuana (II): Does it Damage the Brain?, 185 Science 775 (1974); Depression of Plasma Testosterone Levels After Chronic Intensive Marihuana Use, 290 N.Engl.J.Med. 872 (1974); Plasma Testosterone Levels Before, During and After Chronic Marihuana Smoking, 291 N.Engl.J.Med. 1051 (1974); Marijuana Survey-State of Oregon, Drug Abuse Council (1974).

ous written reports and books were also introduced into evidence.[44]

Marijuana is the common term for dried leaves or stalk of the plant *Cannabis sativa L.* The primary psychoactive ingredient in the plant is delta–9–tetrahydrocannabinol (THC). Most marijuana available in the United States has a THC content of less than one percent. Other cannabis derivatives with a higher THC content, such as hashish, are available in the United States although much less common than is marijuana.

According to figures published by the National Commission on Marihuana and Drug Abuse[45] in 1973, an estimated 26 million Americans have used marijuana at least once. The incidence generally cuts across social and economic classes, though use is greatest among young persons (55%

of 18–21 year-olds have used it). Only about 2% of the adults who have used it were classified by the National Commission as "heavy users" (more than once daily). The experience in Alaska seems to be similar. A report published in the Journal of the American Medical Association in 1971 indicated that 24% of Anchorage school children in grades six through twelve had used marijuana, as had 46% in grades eleven and twelve.[46]

Scientific testimony on the physiological and psychological effects of marijuana on humans generally stresses the variability of effects upon different individuals and on any one individual at different times. The setting and psychological state of the user can affect his responses. Responses also vary with the amount of marijuana one has used in the past. A new user, for instance, often feels no effects at all.

44. It is not the function of this court to reassess the scientific evidence in the manner of a legislature. *See* U. S. v. Thorne, 325 A. 2d 764 (D.C.App.1974), where an attack on the constitutionality of the District of Columbia marijuana statutes was made. There the court said:

> In our opinion the court below misconceived its function in its approach to the constitutionality of the statutory proscription of the possession and use of marijuana. In deciding that this drug has virtually no harmful effects upon the human system, the court had occasion to consider the testimony of four expert witnesses and a voluminous mass of documentary studies. The court weighed this evidence and resolved the conflict to its own satisfaction. If this were a hearing or a trial turning upon the determination of facts upon which there was conflicting testimony, such procedure was, of course, correct.
>
> But a holding that a legislative enactment is invalid cannot rest open a judicial determination of a debatable medical issue. Any party assailing the constitutionality of a statute has the heavy burden of demonstrating that it has no rational basis.
>
> . . . . .
>
> . . . It is apparent from the record in this case that the question decided by the court below after the hearing on the pretrial motions was "at least debatable." Hence, under the tests set forth in *Carolene Products*, the court should have deferred to congressional judgment.

Similarly the Supreme Judicial Court of Massachusetts in Commonwealth v. Leis, 243 N.E.2d 898, 901–02 (1969), said:

> We know of nothing that *compels* the Legislature to thoroughly investigate the available scientific and medical evidence when enacting a law. The test of whether an act of the Legislature is rational and reasonable is not whether the records of the Legislature contain a sufficient basis of fact to sustain that act. The Legislature is presumed to have acted rationally and reasonably. See Commonwealth v. Finnigan, 326 Mass. 378, 379, 96 N.E.2d 715; Coffee-Rich, Inc. v. Commissioner of Pub. Health, 348 Mass. 414, 422, 204 N.E.2d 281. "Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down as violative of the Constitution." Sperry & Hutchinson Co. v. Director of the Div. on the Necessaries of Life of Commonwealth, 307 Mass. 408, 418, 30 N.E.2d 269, 274, 131 A.L.R. 1254. See United States v. Carolene Prod. Co., 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234.

Justice Kirk, in his concurring opinion in *Leis*, also explains the question of legislative judgment and the range of judicial cognizance.

45. Drug Use in America: Problem in Perspective, the Second Report of the National Commission on Marihuana and Drug Abuse (March 1973) at 64.

46. Drug Use in Anchorage, Alaska, 223 J. Am.Med.Ass'n 657 (1971).

The short-term physiological effects are relatively undisputed. An immediate slight increase in the pulse, decrease in salivation, and a slight reddening of the eyes are usually noted. There is also impairment of psychomotor control. These effects generally end within two to three hours of the end of smoking.

Long-term physiological effects raise more controversy among the experts. The National Commission on Marihuana and Drug Abuse reported that among users "no significant physical, biochemical, or mental abnormalities could be attributed solely to their marijuana smoking." [47] Certain researchers have pointed to possible deleterious effects on the body's immune defenses,[48] on the chromosomal structures of users,[49] and on testosterone levels in the body.[50] The methodology of certain of these studies has been extensively criticized by other qualified medical scientists, however. These studies cannot be ignored. It should be noted that most of the damage suggested by these studies comes in the context of intensive use of concentrated forms of THC. It appears that the use of marijuana, as it is presently used in the United States today, does not constitute a public health problem of any significant dimensions. It is, for instance, far more innocuous in terms of physiological and social damage than alcohol or tobacco. But the studies suggesting dangers in intensive

cannabis use do raise valid doubts which cannot be dismissed or discounted.

The immediate psychological effects of marijuana are typically a mild euphoria and a relaxed feeling of well-being. The user may feel a heightened sensitivity to taste and to visual and aural sensations, and his perception of time intervals may be distorted. A desire to become high can lead to a greater high; fear of becoming high or general nervousness can cause the user to fail to experience any high at all. In rare cases, excessive nervousness or fear of the drug can even precipitate a panic reaction. Occasionally a user will experience a negative reaction such as anxiety or depression, particularly when he takes in more of the substance than needed to achieve the desired high. However, in smoking marijuana, the usual method of taking it in this country, the user can self-titrate, or control the amount taken in, since the effect builds up gradually.

Additional short-term effects are an impairment of immediate-past-memory facility and impairment in performing psychomotor tasks. Experienced users seem less impaired in this regard than naive users.

In extremely rare instances, use of marijuana has been known to precipitate psychotic episodes; however, the consensus of the experts seems to be that the potential for precipitating psychotic episodes exists only for a limited number of prepsychotic

47. Marihuana: A Signal of Misunderstanding, First Report of the National Commission on Marihuana and Drug Abuse (March 1972), p. 61.

48. *See* Nahas, et al. Inhibition of Cellular Mediated Immunity in Marihuana Smokers, 183 Science 419 (1974). *But cf.* Normal Skin Test Responses in Chronic Marijuana Users, 186 Science 740 (1974).

49. *See* Stenchever, Statement before the Senate Subcommittee on Internal Security, May 16, 1974. The National Institute on Drug Abuse, in Marihuana and Health, Fourth Report to the United States Congress from the Secretary of Health, Education, and Welfare, states in part:

> The preclinical findings of greatest interest and potential significance during the past two years have been a series of studies

indicating that delta–9–THC (and possibly other marihuana constituents) have an effect upon certain basic cellular mechanisms which involve the uptake of amino acids and the nucleotides into primary nuclear components such as DNA. Since this may interfere with basic biological processes, the preliminary data raises the possibility that the effects of marihuana, under some circumstances, may be more widespread on the organism than has been previously thought.

*Id.* at 6.

50. Depression of Plasma Testosterone Levels After Chronic Intensive Marihuana Use, 290 N.Engl.J.Med. 872 (1974). *But cf.* Plasma Testosterone Levels Before, During and After Chronic Marihuana Smoking, 291 N.Engl.J. Med. 1051 (1974).

persons who could be pushed into psychosis by any number of drug or nondrug-related influences.

There is considerable debate as to the long-term effects of marijuana on mental functioning. Certain researchers cite evidence of an "amotivational syndrome" among long-term heavy cannabis users. However, the main examples of this effect are users in societies where large segments of the population exhibit such traits as social withdrawal and passivity even without drug use. The National Commission concludes that long-time heavy users do not deviate significantly from their social peers in terms of mental functioning, at least to any extent attributable to marijuana use.[51]

The experts generally agree that the early widely-held belief that marijuana use directly causes criminal behavior, and particularly violent, aggressive behavior, has no validity. On the contrary, the National Commission found indications that marijuana inhibits "the expression of aggressive impulses by pacifying the user, interfering with muscle coordination, reducing psychomotor activities and generally producing states of drowsiness, lethargy, timidity and passivity."[52] Moreover, the Commission and most other authorities agree that there is little validity to the theory that marijuana use leads to use of more potent and dangerous drugs. Although it has been stated that the more heavily a user smokes marijuana, the greater the probability that he has used or will use other drugs, "it has been suggested that such use is related to 'drug use proneness' and involvement in drug subcultures rather than to the characteristics of cannabis, *per se*."[53]

The most serious risk to the public health discerned by the National Commission is the possibility of an increase in the number of heavy users, who now constitute about 2% (500,000) of those who have used the drug. Within this group certain emotional changes have been observed among "predisposed individuals" as a result of prolonged heavy use. This group seems to carry the highest risk, particularly in view of the risk of retarding social adjustment among adolescents if heavy use should grow.

Most authorities have accepted the theory that marijuana users develop a "reverse tolerance", that is, that a moderate user needs less and less marijuana over time to achieve a high. Recent research indicates that this may be true only up to a point, and that beyond a certain intensity of use a true tolerance begins to develop.[54] If true, this may be relevant regarding only

---

51. Marihuana: A Signal of Misunderstanding, the First Report of the National Commission on Marihuana and Drug Abuse (March 1972), 63. *See also* Marihuana and Health, Fourth Report to the United States Congress from the Secretary of Health, Education and Welfare (1974), which reads at 12:

> While chronic users in the United States have used for appreciably shorter periods of time than users overseas, studies of American chronic users are potentially of great importance in assessing possible implications of marihuana use for the American population. In one large scale study of undergraduate student use comparisons were made between nonusers (including those who had done a limited amount of experimentation), occasional users and chronic users (those who had used three or more times a week for three years or more or for two years if use was almost daily). No statistical differences in academic performance were found nor was there any evidence of reduced motivation. . . . Another study of moderately using medical students who has used regularly for three or more years and who were matched with nonusing medical students for intelligence, found no difference on an extensive battery of neuropsychological tests.

52. *Id.* at 70–71.

53. Marihuana and Health, Fourth Report to the United States Congress from the Secretary of Health, Education, and Welfare (1974) at 6.

54. "While tolerance to the effects of marihuana has not been generally observed among American users, there is increasingly convincing evidence that tolerance (i. e., larger dosages required to produce the same effects found with lower dosages) does develop under conditions of heavy, regular use. Given

heavy use of concentrated forms of cannabis, since marijuana use is self-limiting due to the forms in which it is taken.

The National Commission rejected the notion that marijuana is physically addicting. It also rejected the notion that marijuana as used in the United States today presents a significant risk of causing psychological dependency in the user. Rather, the experimental or intermittent user develops little or no psychological dependence. Lengthy use on a regular basis does present a risk of such dependence and of subsequent heavier use, and strong psychological dependence is characteristic of heavy users in other countries. This pattern of use is rare in the United States today, however.

While there is no confirmed report of a human ever having died from an overdose of cannabis, the toxic levels of THC have been determined from tests on animals. The lethal dose for marijuana is approximately 40,000 times the dose needed to achieve intoxication. The equivalent ratio of intoxicating to lethal doses for alcohol is 4/10 and for barbiturates is 3/50.

The number of persons arrested for marijuana possession has climbed steeply in recent years. In 1973, over 400,000 marijuana arrests occurred, a 43% rise over the previous year. It should also be noted that 81% of persons arrested for marijuana-related crimes have never been convicted of any crime in the past, and 91% have never been convicted of a drug-related crime.[55]

The justifications offered by the State to uphold AS 17.12.010 are generally that marijuana is a psychoactive drug; that it is not a harmless substance; that heavy use has concomitant risk; that it is capable of precipitating a psychotic reaction in at least individuals who are predisposed towards such reaction; and that its use adversely affects the user's ability to operate an automobile. The State relies upon a number of medical researchers who have raised questions as to the substance's effect on the body's immune system, on chromosomal structure, and on the functioning of the brain. On the other hand, in almost every instance of reports of potential danger arising from marijuana use, reports can be found reaching contradictory results. It appears that there is no firm evidence that marijuana, as presently used in this country, is generally a danger to the user or to others. But neither is there conclusive evidence to the effect that it is harmless.[56] The one significant risk in use of marijuana which we do find established to a reasonable degree of certainty is the effect of marijuana intoxication on driving. We shall return to this aspect of the problem later in this opinion.

Possibly implicit in the State's catalogue of possible dangers of marijuana use is the assumption that the State has the authority to protect the individual from his own folly, that is, that the State can control activities which present no harm to anyone except those enjoying them. Although some courts have found the "public interest" to be broad enough to justify protecting the individual against himself,[57] most have found inherent limitations on the police power of the state. An apposite example is the litigation regarding the constitutionality of laws requiring motorcyclists to wear helmets. Most of the courts addressing the issue, including this one, have resolved it by finding a connection between

---

the relatively low doses and infrequent use typical of present patterns of use in the United States it is not surprising that tolerance has not usually been observed. . . . While the amounts involved were usually large and quite atypical of current use patterns, the probability of a withdrawal syndrome in at least some American heavy users must be considered." Marihuana and Health, Fourth Report to the United States Congress

from the Secretary of Health, Education, and Welfare (1974) at 10, 75–81.

55. Marihuana: A Signal of Misunderstanding, Appendix II, at 622.

56. Petitioner's witnesses, Doctors Fort and Ungerleider, both testified that marijuana was not harmless.

57. E. g., Raines v. State, 225 So.2d 330 (Fla. 1969).

the helmet requirement and the safety of other motorists,[58] but a significant number of courts have explicitly rejected such restrictive measures as beyond the police power of the state because they do not benefit the public.[59] Typical of the logic of these latter cases is the dissent of Justice Abe in *State v. Lee*,[60] in which the Hawaii Supreme Court upheld a motorcycle helmet requirement despite finding no clear link between lack of the equipment by the motorcyclist and injury to others. The court reasoned that where a person's conduct is so reckless, and the resulting injury and death are so widespread as to be of concern to the public, then the conduct affects the public interest and is within the scope of the police power. Justice Abe dissented, citing a general right to be left alone or liberty to do as you please. There has to be a genuine harm to others, he wrote, to justify such controls; a state cannot simply decide what is in a person's best interest and compel it.[61]

We glean from these cases the general proposition that the authority of the state to exert control over the individual extends only to activities of the individual which affect others or the public at large [62] as it relates to matters of public health or safety, or to provide for the general welfare. We believe this tenet to be basic to a free society. The state cannot impose its own notions of morality, propriety, or fashion on individuals when the public has no legitimate interest in the affairs of those individuals. The right of the individual to do as he pleases is not absolute, of course: it can be made to yield when it beings to infringe on the rights and welfare of others.[63]

Further, the authority of the state to control the activities of its citizens is not limited to activities which have a present and immediate impact on the public health or welfare. It is conceivable, for example, that a drug could so seriously develop in its user a withdrawal or amotivational syndrome, that widespread use of the drug could significantly debilitate the fabric of our society. Faced with a substantial possibility of such a result, the state could take measures to combat the possibility. The state is under no obligation to allow otherwise "private" activity which will result in numbers of people becoming public charges or otherwise burdening the public welfare. But we do not find that such a situation exists today regarding marijuana. It appears that effects of marijuana on the individual are not serious enough to justify widespread concern, at least as compared with the far more dangerous effects of alcohol, barbitu-

---

58. *E. g.*, Kingery v. Chappel, 504 P.2d 831 (Alaska 1972); People v. Bielmeyer, 54 Misc.2d 466, 282 N.Y.S.2d 797 (1967); State v. Mele, 103 N.J.Super. 353, 247 A.2d 176 (1968).

59. *E. g.*, American Motorcycle Ass'n v. Davids, 11 Mich.App. 351, 158 N.W.2d 72 (1968); People v. Fries, 42 Ill.2d 446, 250 N. E.2d 149 (1969). See Everhardt v. New Orleans, 208 So.2d 423 (La.App.1968), *rev'd*, 217 So.2d 400 (1969); People v. Carmichael, 53 Misc.2d 584, 279 N.Y.S.2d 272 (1967), *rev'd*, 56 Misc.2d 388, 288 N.Y.S.2d 931 (1968).

60. 51 Haw. 516, 465 P.2d 573 (1970).

61. Similarly, in *State v. Kantner*, 53 Haw. 327, 493 P.2d 306 (1972), which involved the constitutionality of Hawaii's marijuana statute, Justice Abe noted his belief that the statute went beyond the police power of the state because of the lack of evidence that use of marijuana harms anyone other than the user. There is, he wrote, under the Hawaii Constitution a fundamental right of liberty to make a fool of oneself so long as one's act does not endanger others.

62. *Cf.* Liggett Co. v. Baldrige, 278 U.S. 105, 111–12, 49 S.Ct. 57, 59, 73 L.Ed. 204, 208 (1928):

The police power may be exerted in the form of state legislation where otherwise the effect may be to invade rights guaranteed by the Fourteenth Amendment only when such legislation bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare.

63. *See* Roe v. Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147, 177 (1974); Gray v. State, 525 P.2d 524, 528 (Alaska 1974); Breese v. Smith, 501 P.2d 159, 170 (Alaska 1972).

rates and amphetamines. Moreover, the current patterns of use in the United States are not such as would warrant concern that in the future consumption patterns are likely to change.[64]

Research is continuing extensively. Scientific doubts persist, however, and that fact has significance for our application of the law. It is a long-standing rule of law that statutes designed to protect the public health will receive a liberal construction.[65] We have seen repeated examples in recent years where scientific doubts as to the safety of various products, drugs, or environmental conditions have been held to justify controls. There is a presumption in favor of public health measures; when there is substantial doubt as to the safety of a given substance or situation for the public health, controls intended to obviate the danger will usually be upheld.

But one way in which use of marijuana most clearly does affect the general public is in regard to its effect on driving. All of which brings us to the opposite (from the home) end of the scale of the right to privacy in the context of ingestion or possession of marijuana, namely, when the individual is operating a motor vehicle. Recent research has produced increasing evidence of significant impairment of the driving ability of persons under the influence of cannabis.[66] Distortion of time perception, impairment of psychomotor function, and increased selectivity in attentiveness to surroundings apparently can combine to lower driver ability.[67] In this regard, Ravin points out that marijuana usually produces passivity and inactivity, in contrast to alcohol, which increases aggressiveness and is likely to result in overconfidence in one's driving ability. Although a person under the influence of marijuana may be less likely to attempt to drive than

64. We recognize that more potent forms of cannabis than marijuana are commonly used in other countries and are available on a limited scale here. However, studies of use patterns here do not indicate any great likelihood of a significant shift in use here to the more potent substances. If such a shift were to occur, then marijuana use could be characterized as a serious health problem.

65. 3 Sutherland Statutory Construction § 71.02 (4th ed. 1974) and the cases cited in note 42 *supra.*

66. *See* Marihuana and Health, Fourth Report to the United States Congress from the Secretary of Health, Education, and Welfare 105 (1974). This report contains citations to the most recent studies.

67. Evidence that marijuana has a detrimental effect on driving performance, especially as the dose increases, continues to mount. It has been found to increase both braking and starting times, to adversely affect attention and concentration abilities, and to detract from performance on a divided attention task, all of which are presumably involved in driving. A recent Canadian study of driving ability while marijuana-intoxicated examined drivers' performance under both driving course and actual traffic conditions. A significant decline in performance as measured by several criteria was found in most drivers test-

ed. Based on the accumulated evidence, it seems clear that driving while under the influence of marijuana is ill-advised. Marihuana and Health, Fourth Report to the U. S. Congress from the Secretary of Health, Education, and Welfare 10–11 (1974).

Petitioner's own experts do not disagree with the Secretary's conclusions. Dr. Grinspoon testified that " . . . it stands to reason that anybody who is intoxicated or has a psychoactive drug in him should not drive, because there is no question . . . his wherewithall is not with him, and I think that would be the case with marijuana." Dr. Fineglass stated that " . . . moderate or heavy use of marijuana can definitly interfere with some of the local skills that would be necessary for the operation of a motor vehicle, and therefore, in their recommendations did take note of driving while intoxicated as a potential danger to the public safety." Dr. Ungerleider testified that although the immediate effects of marijuana intoxication on the organs and bodily functions are transient and have little or no permanent effect, "there is a definite loss of some psychomotor control, temporary impairment of time space perception. . . . " Later in the course of his testimony, Dr. Ungerleider concluded that recent studies had proven that driving under the influence of marijuana presents a serious risk resulting from impaired driving ability.

a person under the influence of alcohol, there exists the potential for serious harm to the health and safety of the general public.[68]

 In view of the foregoing, we believe that at present, the need for control of drivers under the influence of marijuana and the existing doubts as to the safety of marijuana, demonstrate a sufficient justification for the prohibition found in AS 17.12.010 as an exercise of the state's police power for the public welfare. Given the evidence of the effect of marijuana on driving an individual's right to possess or ingest marijuana while driving would be subject to the prohibition provided for in AS 17.12.010. However, given the relative insigificance of marijuana consumption as a health problem in our society at present, we do not believe that the potential harm generated by drivers under the influence of marijuana, standing alone, creates a close and substantial relationship between the public welfare and control of ingestion of marijuana or possession of it in the home for personal use. Thus we conclude that no adequate justification for the state's intrusion into the citizen's right to privacy by its prohibition of possession of marijuana by an adult for personal consumption in the home has been shown. The privacy of the individual's home cannot be breached absent a persuasive showing of a close and substantial relationship of the intrusion to a legitimate governmental interest. Here, mere scientific doubts will not suffice.

The state must demonstrate a need based on proof that the public health or welfare will in fact suffer if the controls are not applied.

The state has a legitimate concern with avoiding the spread of marijuana use to adolescents who may not be equipped with the maturity to handle the experience prudently, as well as a legitimate concern with the problem of driving under the influence of marijuana. Yet these interests are insufficient to justify intrusions into the rights of adults in the privacy of their own homes.[69] Further, neither the federal or Alaska constitution affords protection for the buying or selling of marijuana, nor absolute protection for its use or possession in public. Possession at home of amounts of marijuana indicative of intent to sell rather than possession for personal use is likewise unprotected.[70]

In view of our holding that possession of marijuana by adults at home for personal use is constitutionally protected, we wish to make clear that we do not mean to condone the use of marijuana. The experts who testified below, including petitioner's witnesses, were unanimously opposed to the use of any psychoactive drugs. We agree completely. It is the responsibility of every individual to consider carefully the ramifications for himself and for those around him of using such substances. With the freedom which our society offers to each of us to order our lives as we see fit goes the duty to live responsibly, for

---

68. Current Alaska law enacted since the trial of this case prohibits driving under the influence of an hallucinogenic drug. AS 28.-35.030. Alaska law also specifically prohibits operation of a boat while under the influence of marijuana. AS 05.25.060.

There does not now exist a means for detecting the presence of cannabis in the body which is available for practical use by law enforcement agencies. Such means are in use in laboratories, however, and research is progressing toward a device which could be used by police in the way that breathalyzer tests for alcohol are used now.

69. We do not intend to imply that the right of privacy in the home does not apply to

children. *See* Breese v. Smith, 501 P.2d 159, 167 (Alaska 1972). We note that distinct government interests with reference to children may justify legislation that could not properly be applied to adults.

70. Statistics indicate that few arrests for simple possession occur in the home except when other crimes are simultaneously being investigated. The trend in general in law enforcement seems to be toward minimal effort against simple users of marijuana, and concentration of efforts against dealers and users of more dangerous substances. Moreover, statistics indicate that most arrests for possession of marijuana in Alaska result in dismissals before trial.

our own sakes and for society's. This result can best be achieved, we believe, without the use of psychoactive substances.

We briefly address Ravin's second assertion of error, namely that AS 17.12.010 denies him due process and equal protection of the law. The argument is two-fold. First, Ravin asserts, the proscription denies equal protection because the other commonly used "recreational" drugs, alcohol and tobacco, are not proscribed, though they inflict far more damage on the user than does marijuana. We reject, however, the assumption that the legislature must apply equal controls to equal threats to the public health. Assuming some degree of control of marijuana use is permissible, it does not follow that the political obstacles to placing controls on alcohol and tobacco should render the legislature unable to regulate other substances equally or less harmful.[71] It is not irrational for the legislature to regulate those public health areas where it can do so, when there exists other areas where controls are less feasible.

Ravin also attacks as irrational the classification of marijuana with the other drugs covered by AS 17.12.150(3) ("depressant, stimulant, or hallucinogenic"). He may be correct that marijuana is the least harmful of the drugs covered by AS 17.12.150(3), but that alone is not sufficient to make the classification irrational. In a number of cases the classification of marijuana either as or with narcotic drugs has been struck down as irrational in view of the relative harmlessness of marijuana.[72] In other cases, courts have deferred to the legislative finding of facts implicit in the classification.[73] However, in every case in which statutes have been struck down, the statutory scheme classified marijuana with, or subject to equal sanctions with, the most dangerous proscribed drugs. In Alaska, however, "hard" drugs are in a completely different category[74] from marijuana, with substantially greater penalties for misuse. The drugs with which marijuana is grouped in AS 17.12.150(3) are not so different from marijuana that yet another classification must be set up for marijuana alone. We find no merit to Ravin's contention on this point.

One other facet of this petition remains for discussion. Ravin urges us to recognize that whatever harm results from marijuana use is far outweighed by the negative aspects of enforcement. Over 400,000 persons were arrested for marijuana-related crimes in 1973; 81% of them had no previous criminal records. Using these statistics, and asserting that marijuana use does not pose a substantial public health threat, Ravin questions the wisdom of AS 17.12.010. We note that the Alaska Bar Association, American Bar Association, National Conference of Commissioners on Uniform State Laws, National Advisory Commission on Criminal Justice Standards and Goals and the Governing Board of the American Medical Association have recommended decriminalization of possession of marijuana. The National Commission on Marihuana and Drug

71. See U. S. v. Maiden, 355 F.Supp. 743 (D. Conn.1973) ; U. S. v. Kiffer, 477 F.2d 349 (2d Cir. 1973). In attacking a complex problem, the state need not choose between attacking every aspect of that problem or not attacking that problem at all. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ; McDonald v. Board of Election Commissioners, 394 U.S. 802, 89 S. Ct. 1404, 22 L.Ed.2d 739 (1969).

72. E. g., People v. McCabe, 49 Ill.2d 338, 275 N.E.2d 407 (1971) ; Attwood v. State, 509 S.W.2d 342 (Tex.Crim.App.1974) ; see People v. Sinclair, 387 Mich. 91, 194 N.W.2d 878 (1972) ; cf. State v. Zornes, 475 P.2d 109 (Wash.1970).

73. E. g., Bettis v. United States, 408 F.2d 563 (9th Cir. 1969) ; Commonwealth v. Leis, 243 N.E.2d 898 (Mass.1969) ; Miller v. Texas, 458 S.W.2d 680 (Tex.Crim.App.1970) ; Raines v. State, 225 So.2d 330 (Fla.1969) ; People v. McKenzie, 169 Colo. 521, 458 P.2d 232 (1969) ; People v. Stark, 157 Colo. 59, 400 P.2d 923 (1965). See State v. Kantner, 53 Haw. 327, 493 P.2d 306 (1972).

74. See AS 17.10.010 et seq. (The Uniform Narcotic Drug Act).

Abuse has recommended that private possession for personal use no longer be an offense. A Canadian study has arrived at similar results. And at least one state, Oregon, has already decriminalized possession of small amounts of marijuana.[75]

In opposition, the State argues that under Alaska's constitutional system of separate but equal branches of government the issue is a "political controversy over the State's fundamental policy toward the drug marijuana". Thus, the "issue should be properly determined by the people's elected representatives". We agree that determination of the wisdom of a particular legislative enactment is more properly the subject of investigation and resolution by the legislature rather than the judiciary.

The record does not disclose any facts as to the situs of Ravin's arrest and his alleged possession of marijuana. In view of these circumstances, we hold that the matter must be remanded to the district court for the purpose of developing the facts concerning Ravin's arrest and circumstances of his possession of marijuana. Once this is accomplished, the district court is to consider Ravin's motion to dismiss in conformity with this opinion.

Remanded for further proceedings consistent with this opinion.

BOOCHEVER, Justice (concurring, with whom CONNOR, Justice, joins).

Because of the importance of the issues discussed in this case and the possibility that portions of the opinion may be construed as substantially circumscribing the Alaska Constitutional right to privacy, I find it necessary to file this concurrence. By its reliance on certain United States Supreme Court cases[1] and the manner in which some of the conclusions are set forth, the opinion may be read as limiting the right of privacy principally to protection of activities engaged in within the confines of the home.[2] The opinion relies chiefly on United States Supreme Court precedent, although there is no Federal Constitutional provision corresponding to art. 1, § 22 of the Alaska Constitution which specifies that "the right of the people to privacy is recognized and shall not be infringed". While Federal cases defining the right of privacy derived from other provisions of the United States Constitution are of assistance in determining the perimeters of our constitutional right to privacy, we are certainly not bound by those cases in construing the separate Alaska provision. Even when Alaska Constitutional provisions are closely akin to those of the Federal Constitution, we have stated:

> While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land. Instead, we should be moving concurrently to develop and expound the principles embedded in our constitutional law.[3]

Although the majority opinion emphasizes the right of privacy in the home, it rec-

---

75. O.R.S. 167.207. The Alaska legislature have also recently passed a bill which would decriminalize possession of marijuana in certain contexts.

1. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

2. The court writes that art. I, § 22 of the Alaska Constitution " . . . was intended to give recognition and protection to the home".

3. Baker v. City of Fairbanks, 471 P.2d 386, 401–02 (Alaska 1970) (footnotes omitted).

ognizes that analysis of the Federal decisions does not indicate that the right of privacy is relegated to the home. It is true that *Griswold v. Connecticut* [4] invalidated a Connecticut statute prohibiting the distribution of contraceptives and the dissemination of birth control information to married adults by finding a right of privacy, emanating from other constitutional provisions, within which the marital relationship, arguably home related, was protected. But the later case of *Eisenstadt v. Baird* [5] held that a statute prohibiting the distribution of contraceptives to unmarried persons but allowing such distribution to married persons violated the equal protection clause of the fourteenth amendment. In so holding, the Court referred to *Griswold* and explained what the case stood for.

> If under Griswold the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in Griswold the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each · with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. [6]

The Court held that the right of privacy involved being free to decide for oneself whether to bear or beget a child, a right relating to the automony of the individual, not to a place.

Similarly, *Roe v. Wade,* [7] in upholding the right of a woman to decide whether she should terminate her pregnancy, stated:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. [8]

Again, the right of privacy pertained to the freedom of the individual to decide as to her course of action and was unrelated to any situs.

On the other hand, there are the *Stanley—Paris Adult Theatre I* group of cases [9] holding that the "broad power to regulate obscenity does not extend to mere possession by the individual in the privacy of his own home" although obscenity is not otherwise constitutionally immune from state regulation.

Thus it appears that the United States Supreme Court has found a right of privacy to exist as to activities within the home or with reference to values associated with the home, and, additionally, as a right of personal autonomy, to make decisions that shape an individual's personal life. [10]

Since the citizens of Alaska, with their strong emphasis on individual liberty, enacted an amendment to the Alaska Constitution expressly providing for a right to

4. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

5. 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

6. *Id.* 405 U.S. at 453, 92 S.Ct. at 1038, 31 L.Ed.2d at 362.

7. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

8. *Id.* 410 U.S. at 153, 93 S.Ct. at 727, 35 L.Ed.2d at 177.

9. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L. Ed.2d 513 (1973); United States v. 12 200-Ft. Reels, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

10. On Privacy: Constitutional Protection for Personal Liberty, 48 N.Y.U.L.Rev. 670, 703 (1973).

privacy not found in the United States Constitution, it can only be concluded that that right is broader in scope than that of the Federal Constitution. As such, it includes not only activities within the home and values associated with the home, but also the right to be left alone and to do as one pleases as long as the activity does not infringe on the rights of others. Thus, the decision whether to ingest food, beverages or other substances comes within the purview of that right to privacy.[11]

The right to privacy, however, is not monolithic. For example, the right to decide whether to eat strawberry ice cream cannot be placed on the same level as that of deciding whether to bear a child. Moreover, the importance of the right may properly be related to the place where it is exercised, for example, at the home or in the market place. Other considerations would be the nature of relationships involved (marital, doctor-patient, attorney-client, etc.), the particular activity in question and the individual's interest in it.

Having discussed generally the contours of what I perceive to be the right to privacy under the Alaska Constitution, I shall turn briefly to the test utilized by the court in determining infringements of that right. Particularly in equal protection cases, but also as to cases alleging infringement of other constitutional rights, the United States Supreme Court,[12] and this court[13] in the past, have followed a two-tiered test. If the right involved was deemed to be "fundamental", a statute infringing upon it was required to be "necessary" to further a "compelling state interest". Whereas if the right infringed upon was classified as non-fundamental, any rational basis that might be conceived to justify the legislation was held to be sufficient.[14] As a practical matter, the test was result oriented, since once a right was declared to be fundamental, the challenged regulation or legislative act would be stricken,[15] whereas otherwise some reason could usually be found to sustain it.

I agree with the majority's departure from that test in areas where we have discretion to depart from standards established by the United States Supreme Court. With reference to laws challenged as invading the Alaskan right of privacy,[16] I would apply a single flexible test dependent first upon the importance of the right involved. Based on the nature of that right, a greater or lesser burden would be placed on the state to show the relationship of the intrusion to a legitimate governmental interest. I agree with the majority opinion that interference with rights of privacy within one's home requires a very high level of justification. Similar considerations would apply to certain relationships, without reference to situs, i. e. attorney-client, doctor-patient, priest-parishioner, marital relationship, parent-child. In all cases involving a right of privacy, I believe that the relationship of the intrusion to a legitimate governmental interest must be carefully examined. The court should not abandon protection of the right of an individual to decide how to conduct his life because a rational basis may be "con-

11. Gray v. State, 525 P.2d 524 (Alaska 1974).

12. *See* Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973).

13. Lynden Transport, Inc. v. State, 532 P. 2d 700 (Alaska 1975); Breese v. Smith, 501 P.2d 159 (Alaska 1972).

14. Lynden Transport, Inc. v. State, 532 P.2d 700, 706 (Alaska 1975).

15. Where a fundamental right has required use of the compelling state interest test, only one law has been found valid by the Supreme Court, Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), but no state law has passed muster. Dunn v. Blumstein, 405 U.S. 330, 363–64, 92 S.Ct. 995, 31 L.Ed.2d 274, 296–97 (1972) (Burger, C. J., dissenting). *See* 48 N.Y.U.L.Rev. 670 at 702. *See also* Gilbert v. State, 526 P.2d 1131 (Alaska 1974).

16. Of course, in any event where Federal Constitutional rights are involved, we must at least apply the minimum standards prescribed by the United States Supreme Court. Baker v. City of Fairbanks, 471 P.2d 386. 401–02 (Alaska 1970).

ceived" for the legislation in question. The importance of the governmental interest and the means utilized to accomplish this goal must be balanced against the nature of the particular right of privacy.[17]

Applying this test to the facts in this case, assuming that the defendant was found in possession of marijuana in an automobile, I agree with the majority that a valid reason existed for the prohibition due to the proven effect of marijuana on driving, and the unavailability of practical tests for ascertaining whether one is under the influence of an hallucinogenic when balanced against the rather minor status of the right involved, to possess marijuana in public. Accordingly, I would affirm the order denying the motion to dismiss.

CONNOR, Justice (concurring).

I concur in the majority opinion and the separate concurring opinion of Justice BOOCHEVER, but wish to add some observations.

The decision today properly leaves unanswered the question of how far the right to privacy, in connection with the possession of marijuana, extends outside the home. Such a determination can be made only when we are presented with specific facts against which the individual's claim of privacy can be measured, as opposed to the state's assertion of power to control the possession of marijuana. Under the test we have employed in determining the scope of the right to privacy, it is necessary to balance these conflicting claims and determine whether the state's prohibition bears a direct and substantial relationship to effectuating a legitimate state interest.

The record in the case before us does not contain facts about the particular circumstances in which appellant possessed marijuana. Accordingly, we must remand

the case for further elucidation of the facts.

It is certain that the right to privacy does not vanish when one leaves the home.[1] There are certain aspects of personal autonomy which one carries with him even when he ventures out of the home, though the claim to privacy diminishes in proportion to the extent that one's person and one's activities impinge upon other persons. But, in order to trace the contours of the right to privacy, it will be necessary to engage in a critical analysis of the facts of each case which presents itself for decision. Only in this fashion can the right to privacy, outside the home, be determined on a reasoned, coherent basis so as to furnish the courts and the public with reliable rules of action. Much definitional work, therefore, remains to be done in the cases yet to be determined.

---

17. 48 N.Y.U.L.Rev. 670 at 705.

1. The right to privacy which received protection in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), has nothing to do with the locus of the home and, for the most part, is concerned with matters occurring outside the home.