**Hugh HARRISON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 7407.**

Court of Appeals of Alaska.

Aug. 31, 1984.

Randall Simpson and Gary C. Sleeper, Jermain, Dunnagan & Owens, Anchorage, for appellant.

Peter A. Michalski, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Following a jury trial, Hugh Harrison was convicted of importing alcohol into the village of St. Mary's in violation of AS 04.11.496(b). On appeal, Harrison challenges the constitutionality of Alaska's local option law, arguing that it violates the equal protection and due process clauses of the United States and Alaska Constitutions and the privacy clause of the Alaska Constitution. Harrison also challenges his conviction on *ex post facto* grounds. After reviewing Harrison's claims, we conclude that his conviction must be affirmed.

In order to place Harrison's arguments in context, it is helpful to review the background of Alaska's local option law. Alcohol abuse has been and continues to be a problem in Alaska. A comprehensive study of this issue was released in 1977 by the Analysis of Alcohol Problems Project. Several of the study's conclusions illustrated the extent of alcohol problems in Alaska. For example, Alaska's rate of death due directly to alcoholism increased 153% from 1959 to 1975, and Alaska's alcoholism mortality rate in 1975 was 418% higher than the national average. Analysis of Alcohol Problems Project, *Working Papers:*

*Descriptive Analysis of the Impact of Alcoholism and Alcohol Abuse in Alaska, 1975,* vol. V at 14 (1977). From 1958 to 1975, Alaska's rate of annual consumption increased at almost twice the rate of the national average. *Id.* at 42. The total economic cost of alcoholism and alcohol abuse to Alaska in 1975 was reported to be 131.2 million dollars. *Id.* at 32. The study noted that the impact of alcohol-related problems was greater in rural areas. *Id.* at 4.

In 1976, the Governor's Commission on the Administration of Justice concluded that crime in Alaska is significantly related to the excessive and unregulated consumption of alcohol. Governor's Commission on the Administration of Justice, *Standards and Goals for Criminal Justice* at 41 (1976). The Commission noted that, according to the National Council on Alcoholism, one out of every ten Alaskans is an alcoholic. *Id.* The Commission recommended that rural villages be allowed to control alcoholic beverages. *Id.* at 14.

In 1980, the Alaska Judicial Council published a report entitled *Alaska Felony Sentences: 1976–1979.* The report found a significant relationship between the use of alcohol and criminal behavior. This association was most significant in rural areas of the state where, according to the Council, 77.9% of violent crimes and 55.6% of property crimes were committed under the influence of alcohol. Alaska Judicial Council, *Alaska Felony Sentences: 1976–1979* at 45–48, 65–67 (1980).[1]

In response to the growing evidence of a strong relationship between alcohol abuse and crime, Alaska's local option law was enacted in 1980. Under the law, any municipal government that desires to regulate the importation or distribution of alcoholic beverages can conduct a referendum election. A community choosing to hold a ref-

---

**1.** In 1981, the House Task Force on Violent Crime was established to examine the causes of violent crime. The Task Force began by holding public hearings throughout the state; it reported:

> Another dominant theme in the testimony was the relationship between violent crime

and alcohol abuse. Police, prosecutors, judges, community leaders and victims testified that alcohol abuse and violent crime are inseparable.

House Task Force on Violent Crime, *Report to the First Session Twelfth Alaska Legislative* at 8–9 (1981).

erendum election is given several options. It may completely prohibit the sale of alcoholic beverages, AS 04.11.490. It may prohibit the sale except by specifically licensed establishments, AS 04.11.492, or by those holding selected types of licenses, AS 04.11.500. Or, it may completely prohibit both the sale and importation of alcoholic beverages, AS 04.11.496. Local referendum elections are conducted under state supervision, and when the results of a local election are certified by the state, violations of any restrictions adopted in the election are subject to criminal prosecution by the state. AS 04.11.502; AS 04.16.200.

The village of St. Mary's held a referendum election under the local option law on September 22, 1981, and voted to prohibit the sale and importation of alcoholic beverages. The prohibition became effective October 1, 1981. During the latter part of 1981, Harrison, a state trooper, was transferred to St. Mary's. On April 16, 1982, Harrison flew an airplane from St. Mary's to Nome, where he purchased vodka and several cases of beer. He returned to St. Mary's with the liquor. The police searched Harrison's residence on April 18th and found over sixty-two liters of beer and 1.75 liters of vodka. Harrison was indicted for the importation of alcohol, in violation of AS 04.11.496(b).[2] AS 04.11.496 provides, in relevant part:

> (a) The following question, appearing alone, may be placed before the voters of a municipality or an established village in accordance with AS 04.11.502: "Shall the sale and importation of alcoholic beverages be prohibited in ... (name of municipality or village)? (yes or no)".

> (b) If a majority of the voters vote "yes" on the question set out in (a) of this section, a person, beginning on the first day of the month following certification of the results of the election, may not knowingly send, transport, or bring

alcoholic beverages into the municipality or established village.

Prior to trial, Harrison moved to dismiss his indictment on constitutional grounds. He argued that the St. Mary's local option law violated his right to privacy and equal protection and that the distinction between the misdemeanor and felony classifications in the statute violated his right to due process. Harrison also contended that the application of the local option law to his conduct violated the constitutional prohibition against *ex post facto* laws. At the pretrial hearing before Superior Court Judge James R. Blair, Harrison expressly acknowledged the evidence presented by the state indicating a correlation between alcohol abuse and serious health and social problems. Harrison did, however, present expert testimony that the incidence of coronary disease was lower among moderate drinkers than non-drinkers. Harrison's expert also testified that an increased availability of alcohol results in a proportional increase in moderate drinkers and a proportional decrease in heavy users and abstainers. Judge Blair denied Harrison's motions to dismiss. Harrison was subsequently convicted, and now appeals the denial of his motions.

### PRIVACY

Harrison claims that the prohibition against importation of alcohol into St. Mary's violates his right to privacy under the Alaska Constitution.[3] In *Ravin v. State*, 537 P.2d 494 (Alaska 1975), the defendant argued that the prohibition of the possession of marijuana violated his right to privacy. The court in *Ravin* noted the traditional standard that applied to a claimed infringement of a fundamental constitutional right:

> Once a fundamental right under the constitution of Alaska has been shown to be involved and it has been further shown that this constitutionally protected right

---

2. Harrison was also indicted on two other charges, which are not relevant to this appeal.

3. Article I, section 22 of the Alaska Constitution states in part:

*Right of Privacy.* The right of the people to privacy is recognized and shall not be infringed....

has been impaired by governmental action, then the government must come forward and meet its substantial burden of establishing that the abridgement in question was justified by a compelling government interest.

*Ravin,* 537 P.2d at 497 (footnote omitted) (quoting *Breese v. Smith,* 501 P.2d 159, 171 (Alaska 1972)). However, the court expressed considerable dissatisfaction with the traditional fundamental right/compelling state interest test. *Ravin,* 537 P.2d at 498. The court went on to determine Ravin's privacy claims in the following manner:

It is appropriate in this case to resolve Ravin's privacy claims by determining whether there is a proper governmental interest in imposing restrictions on marijuana use and whether the means chosen bear a substantial relationship to the legislative purpose. If governmental restrictions interfere with the individual's right to privacy, we will require that the relationship between means and ends be not merely reasonable but close and substantial.

Thus, our undertaking is two-fold: we must first determine the nature of Ravin's right, if any, abridged by [the statute prohibiting possession of marijuana], and, if any rights have been infringed upon, then resolve the further question as to whether the statutory impingement is justified.

*Ravin,* 537 P.2d at 498.

The court in *Ravin* held that even if it were to use the fundamental right/compelling state interest test, there was no fundamental right, either under the Alaska or federal constitutions, to possess or ingest marijuana. *Ravin,* 537 P.2d at 502. However, because the right of privacy under the Alaska Constitution clearly shielded the ingestion of food, beverages and other substances, subject to overriding public health considerations, the court also concluded that its analysis would not be complete without a closer examination of the right to privacy and the "relevancy of where the right is exercised." *Id.* The court "recog-nized the distinctive nature of the home as a place where the individual's privacy receives special protection." *Ravin,* 537 P.2d at 503. It concluded:

This right to privacy would encompass the possession and ingestion of substances such as marijuana in a purely personal, non-commercial context in the home unless the state can meet its substantial burden and show that proscription of possession of marijuana in the home is supportable by achievement of a legitimate state interest.

*Ravin,* 537 P.2d at 504. The court reviewed the evidence presented at the omnibus hearing and concluded that the use of marijuana does not constitute a significant public health problem, with the exception of persons driving under the influence of cannabis. *Ravin,* 537 P.2d at 506, 509, 511. The court held that, given the evidence demonstrating the relative harmlessness of the drug, an individual's right of privacy in the home outweighed the government's interest in regulating the personal use of marijuana in the home. *Ravin,* 537 P.2d at 511.

In *State v. Erickson,* 574 P.2d 1 (Alaska 1978), the court applied the *Ravin* standard to a claim that the prohibition against cocaine possession and use in the home violated the right to privacy. The court observed that the authorities agreed that cocaine is a more dangerous drug than marijuana. *Erickson,* 574 P.2d at 21–23. For example, cocaine, unlike marijuana, can cause death. *Id.* The court noted the special protection accorded to the home, stating that "[w]here the right to privacy is manifested in terms of interests more squarely within personal autonomy, the balance [of the individual's interest in privacy and the government's interest in health and safety] requires a heavier burden on the state to sustain the legislation in light of the right involved." *Erickson,* 574 P.2d at 22 n.144. In upholding the prohibition against the personal use and possession of cocaine in the home, the court found a "sufficiently close and substantial relationship" between the prohibition and the

legislative purpose of protecting the general health and welfare. *Erickson,* 574 P.2d at 22.

■ Our first step under *Ravin* is to evaluate the nature of the right abridged by the local option law. Harrison apparently concedes that the right to consume alcohol is not a fundamental or absolute right.[4] Moreover, the right to consume alcohol in the home is not directly at issue in this case. AS 04.11.496(b), the statute under which Harrison was convicted, merely prohibits a person from knowingly sending, transporting, or bringing alcoholic beverages into the community. It does not prohibit the use of alcoholic beverages in the home. Although we conclude that there is no fundamental right to possess or consume alcohol, *see Ravin,* 537 P.2d at 502, this conclusion does not end our analysis. Since there is a strong, if not direct, relationship between regulating importation of alcohol and regulating consumption of alcohol, and since the privacy amendment of the Alaska Constitution clearly "shields the ingestion of food, beverages or other substances," *Ravin,* 537 P.2d at 502, (quoting *Gray v. State,* 525 P.2d 524, 528 (Alaska 1974)), we must more closely examine the right to privacy asserted in this case.

■ Harrison characterizes the interest in drinking alcoholic beverages as "fundamental to personal lifestyle." We believe that the consumption of alcoholic beverages in the home, while not a fundamental right, touches on a privacy interest that is "more squarely within personal autonomy." *Erickson,* 574 P.2d at 22 n.144. Therefore, even when the state seeks to regulate consumption indirectly, through restrictions on importation, it bears a heavy burden of justifying the regulation as a legitimate health and welfare measure.

These considerations lead us to the second step in the *Ravin* analysis: whether the state has shown both that the local option law is justifiable as a health and welfare measure, and that the means chosen to regulate alcoholic beverages bears a sufficiently close and substantial relationship to the legislative purpose of protecting the public health and welfare.[5] *Ravin v. State,* 537 P.2d at 504. *See also State v. Erickson,* 574 P.2d at 22 (applying the *Ravin* standard to possession of cocaine). In making this determination, we must keep in mind the general proposition set forth in *Ravin:* "the authority of the state to exert control over the individual extends only to activities of the individual which affect others or the public at large as it relates to matters of public health or safety, or to provide for the general welfare." *Ravin,* 537 P.2d at 509.

■ The evidence presented at the omnibus hearing unmistakably established a correlation between alcohol consumption and poor health, death, family violence, child abuse, and crime. Harrison did not dispute this evidence. Given this evidence, we conclude that the state has met its burden of justifying the local option law as a health and welfare measure. Our conclusion is supported by the supreme court's express recognition of the deleterious effects of consuming alcoholic beverages. In *Ravin v. State,* 537 P.2d at 509–10, the court observed:

> It appears that effects of marijuana on the individual are not serious enough to justify a widespread concern, at least

4. We reject Harrison's claim that the local option law constitutes an impermissible racial classification. Any municipal government or established village may enact a prohibition against the sale or importation of alcoholic beverages. Once enacted, the prohibition applies to all persons in the municipality or village, regardless of race.

5. Harrison vigorously asserts that the legislature's true purpose in enacting the local option law was to "invade the privacy of individual Alaska residents in their homes and prevent them from consuming alcoholic beverages." This claim is without merit. We think the legislature's purpose was to regulate the distribution and availability of substances that are harmful to the health and welfare of Alaskans. The legislature's purpose would be improper only if the consumption of alcoholic beverages was not substantially harmful. *See Erickson,* 574 P.2d at 16.

compared with the far more dangerous effects of alcohol, barbiturates and amphetamines.

In *State v. Erickson*, 574 P.2d at 22, the court, after reviewing the record, noted that "cocaine is probably less dangerous than alcohol." Thus, the Alaska Supreme Court, in concluding that marijuana is a relatively harmless drug and that cocaine is a dangerous enough drug to warrant criminalization of its possession, has expressly found that alcohol is more dangerous than either drug.

We further believe that there is a sufficiently close and substantial relationship between the local option law and the legislative purpose of protecting the public health and welfare. Harrison contends that each community, regardless of size, location, and composition, has a large group of moderate users and small groups of abstainers and abusers. Harrison points to evidence suggesting that moderate consumption of alcoholic beverages may be medically beneficial. The prohibition of sale and importation enacted by St. Mary's, Harrison argues, improperly punishes all the moderate users of alcoholic beverages in order to address the problems created by the relatively small number of alcohol abusers. Noting that alcoholic beverages can be obtained in other areas, Harrison asserts that prohibiting the sale and importation of alcoholic beverages in St. Mary's is not substantially related to any legitimate state purpose. We disagree.

■ While moderate use of alcoholic beverages may be beneficial, the evidence showing the harmful effects of consumption is undisputed. The legislature, after considering the severe social costs of alcohol abuse, concluded that all communities should have the option of controlling the level of local distribution and availability. Even though decreased restrictions on the availability of alcoholic beverages may, as Harrison argues, increase the proportion of moderate consumers to alcohol abusers, broadened access to alcoholic beverages will undoubtedly increase the absolute number of alcohol abusers. The threat posed to society by widespread alcohol abuse is enormous. We believe that enactment of Alaska's local option law bears a close and substantial relationship to the legitimate legislative goal of protecting the public health and welfare by curbing the level of alcohol abuse in our state.[6] *See State v. Erickson*, 574 P.2d at 22 and n.144. *Cf. Ravin v. State*, 537 P.2d at 511 (state demonstrated sufficient justification for prohibiting possession of marijuana while driving).

## EQUAL PROTECTION

Harrison argues that the state cannot, in the absence of a compelling governmental interest, permit one community to ban the importation of alcoholic beverages and simultaneously permit other communities to allow importation. He argues that, as enacted in St. Mary's, the statute is overinclusive because moderate consumers' access to alcoholic beverages is limited and underinclusive because alcohol-related problems will still occur in nearby areas that have not enacted a local option law.

Alaska takes the following approach to equal protection analysis:

6. We are, furthermore, not persuaded by Harrison's argument that Alaska's local option law violates privacy rights protected by the federal constitution. The federal cases have uniformly held that there is no federal right to consume alcoholic beverages. *See Dunagin v. City of Oxford*, Miss., 489 F.Supp. 763, 771–72 n. 11 (N.D.Miss.1980), *aff'd* 718 F.2d 738 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); *Felix v. Milliken*, 463 F.Supp. 1360, 1371–72 (E.D.Mich.1978); *Republican College Council of Pennsylvania v. Winner*, 357 F.Supp. 739, 740 (E.D.Pa.1973). Examples of privacy rights protected by the federal constitution are the right to abortion, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the right to choose one's spouse, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the right to receive information about birth control, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and the right to reproduce, *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). We believe that the consumption of alcoholic beverages does not rise to the same level as these rights.

In contrast to the rigid tiers of federal equal protection analysis, we have postulated a single sliding scale of review ranging from relaxed scrutiny to strict scrutiny. The applicable standard of review for a given case is to be determined by the importance of the individual rights asserted and by the degree of suspicion with which we view the resulting classification scheme. As legislation burdens more fundamental rights, such as rights to speak and travel freely, it is subjected to more rigorous scrutiny at a more elevated position on our sliding scale. Likewise, laws which embody classification schemes that are more constitutionally suspect, such as laws discriminating against racial or ethnic minorities, are more strictly scrutinized. This approach was first announced in *State v. Erickson,* ....

Having selected a standard of review on the *Erickson* sliding scale, we then apply it to the challenged legislation. This is done by scrutinizing the importance of the governmental interests which it is asserted that the legislation is designed to serve and the closeness of the means-to-ends fit between the legislation and those interests. As the level of scrutiny selected is higher on the *Erickson* scale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly closer. On the other hand, if relaxed scrutiny is indicated, less important governmental objectives will suffice and a greater degree of over/or underinclusiveness in the means-to-ends fit will be tolerated. As a minimum, we require that the legislation be based on a legitimate public purpose and that the classification "be reasonable, not arbitrary, and ... rest upon some ground of difference having a fair and substantial relation to the object of the legislation ...."

*State v. Ostrosky,* 667 P.2d 1184, 1192–93 (Alaska 1983) (footnotes and citations omitted), *appeal dismissed,* —— U.S. ——, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984).

As we have previously indicated in connection with the privacy issue, the individual interest asserted by Harrison is not a fundamental right; however, it should be viewed with a higher level of scrutiny than is required under the traditional "rational basis" test, because the consumption of alcoholic beverages is an interest "squarely within personal autonomy." *Erickson,* 574 P.2d at 22 n. 144. We believe that the state's compelling interest in curbing the problem of alcohol abuse cannot be ignored. In addressing regulations of the commercial sale of alcohol, the supreme court has noted:

> The legislature was dealing with a business which, unlike other commercial enterprises, possesses the capacity for grave and harmful effects upon the public welfare .... It is because of this that there may be either complete prohibition, if the legislature chooses to follow that course, or if not, that there may be conditions imposed which will have the tendency to afford the greatest degree of protection to the citizens of the state.

*Boehl v. Sabre Jet Room, Inc.,* 349 P.2d 585, 589 (Alaska 1960) (footnote omitted). Given the compelling nature of the interest asserted by the state, we conclude that the provisions of Alaska's local option law are reasonable and sufficiently related to the legislative goal sought to be accomplished by the statute.

Equal protection does not require perfect equality and uniformity in the application of a regulatory scheme. *Suber v. Alaska State Bond Committee,* 414 P.2d 546, 554 (Alaska 1966). Thus, the statute does not violate equal protection simply because moderate consumers may not have access to alcoholic beverages in a community that has enacted a local option law. As we have already indicated in our privacy analysis, the use of the local option law to address the alcohol abuser bears a close and substantial relationship to the legislative goal of protecting the public health and welfare, even though the law may have the effect of preventing moderate users from consuming alcoholic beverages.

■ Harrison also argues that the local option law is underinclusive because it permits alcohol abuse to continue in communities that have chosen not to regulate the consumption of alcoholic beverages. However, every citizen of the state need not be treated exactly alike, regardless of geographical location and other similar considerations. *McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 400 (1961). The question is whether differences in treatment are reasonable in light of the balance between the importance of the legislative intent, on the one hand, and the interest of the individual, on the other. The local option law applies with equal force on two distinct levels. It applies equally throughout the state by conferring upon all municipalities and established villages the option of restricting the importation or sale of alcoholic beverages. In addition, once a community has enacted a local option law, that law applies equally to all persons in that community. For the purpose of differentiating between communities and defining community boundaries, the local option law relies on the established system of municipal governments previously created by our legislature to permit local handling of a wide variety of governmental matters. We see no basis for concluding that differences in the treatment of citizens from different communities under the local option law should be considered constitutionally significant when those differences result only from the extent to which individual communities elect to implement that law. When the state attacks a complex problem it need not choose between attacking every aspect of that problem and doing nothing at all. *Ravin,* 537 P.2d at 512 n. 71. Under the local option law, similarly situated persons are treated alike. *See State v. Erickson,* 574 P.2d at 11. We conclude that the law does not violate equal protection merely because it gives individual communities the discretion to determine the level of alcohol availability that will be permitted within their boundaries.

Harrison next argues that the penalties for violating the St. Mary's local option law violate equal protection. The penalty provisions classify alcoholic beverages into distilled spirits, wine, and malt beverages. The importation of each type of beverage, up to a specified maximum volume, is punishable as a misdemeanor. The maximum volumes correspond to the percentage of alcohol in each type of beverage. Thus, the maximum volume of distilled spirits that is punishable as a felony is substantially less than that prescribed for malt beverages. Importation of an amount of alcohol that exceeds the maximum levels prescribed for a misdemeanor is punishable as a felony.[7]

Harrison maintains that the felony classification based upon quantity and type of alcoholic beverage violates equal protection because it does not bear a fair and substantial relation to the protection of the public health and welfare. Harrison argues that a quantity distinction should not apply to alcoholic beverages because alcohol is not contraband.

■ We disagree. Classifications need not be perfect. *Suber v. Alaska Bond Committee,* 414 P.2d 546, 554 (Alaska 1966). The classification in this case is not irrational. The potential for harm increases with the amount of alcohol consumed; therefore, the legislature could have reasonably believed that punishing the larger importer more severely bore a fair and substantial relationship to the goal of reducing alcohol-related problems. More severe sanctions based on increased quantities of drugs are common. *See generally* AS 11.71.040–.080 (statutes govern-

7. AS 04.16.200(e) provides:

A person who sends, transports, or brings alcoholic beverages into a municipality or established village in violation of AS 04.11.496 is, upon conviction,

(1) guilty of a class A misdemeanor if the quantity is less than 12 liters of distilled spir-

its, 24 liters of wine, or 45 liters of malt beverages; or

(2) guilty of a class C felony if the quantity imported is 12 liters or more of distilled spirits, 24 liters or more of wine, or 45 liters or more of malt beverages.

ing controlled substances).[8] Moreover, the quantity distinctions between the respective beverages are reasonable. Distilled spirits have the highest percentage of alcohol, with wine and beer, respectively, having lower percentages. As the percentage of alcohol increases, the amount of beverage required to become intoxicated decreases. Thus, the significantly lower threshhold volumes for felony criminal sanctions for importation of distilled spirits, as opposed to wine, and for wine, as opposed to malt beverages, are reasonable. We therefore do not find Harrison's equal protection challenge persuasive.

## DUE PROCESS

Harrison argues that his constitutional right to due process was violated because, under AS 04.16.200(e), the statutory distinction between a misdemeanant and a felon is based solely on the type and quantity of alcoholic beverages imported. Harrison posits that it would be irrational to enhance the punishment for importation based on the quantities of alcoholic beverages involved if the importation were solely for the personal use of the importer. Thus, Harrison reasons that the distinction between felony and misdemeanor importation creates an irrebutable presumption that larger quantities of alcoholic beverages are imported for sale. Harrison therefore concludes that the trial court erred in refusing to instruct the jury that if it found credible evidence that he did not intend to sell or distribute the alcoholic beverages he im-

ported to St. Mary's, it was required to acquit him.

■ Harrison's claim is without merit, since his initial premise is mistaken. The greater the volume of alcoholic beverages imported, the greater the potential for abuse, whether importation is for sale or personal use. A person who imports a larger quantity of alcoholic beverages for personal use will be capable of maintaining a high level of intoxication for an extended period of time and may create a continuing problem of alcohol abuse. A long-term problem of this type is potentially as costly and dangerous to a community as the shorter term problem that might result if the same quantity of alcoholic beverage was imported and sold to a number of people who consumed it immediately. As Judge Blair found, the statute is silent on the issue of intent: it sanctions importation, whether it be for personal use or for sale. The cases upon which Harrison relies, *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), and *Manley v. Georgia*, 279 U.S. 1, 49 S.Ct. 215, 73 L.Ed. 575 (1929), are inapposite, because each of the statutes in those cases specifically sets forth a presumption and each presumption was found to be invalid. Harrison speculates on the legislature's intent and asks us to imply a presumption on the basis of his speculation. We decline to do so.

Harrison also alleges that the local option law unfairly permits persons charged with sale of alcoholic beverages to raise a defense that is unavailable to persons charged with importation. AS 04.11.010 [9]

8. Harrison submits that the criminal statutes subjecting offenders to varying degrees of punishment based on quantities, *e.g.*, theft, forgery, and sale of drug laws, are irrelevant because the conduct of importing alcohol is *malum prohibitum* rather than *malum in se*. We do not find this distinction persuasive. We note that Harrison has not cited any cases that would require us to condemn the quantity distinctions because the regulated conduct is *malum prohibitum* rather than *malum in se*. Moreover, it is arguable that many of the offenses established by statutes dealing with controlled substances are *malum prohibitum*, rather than *malum in se*. Thus, the validity of the distinction Harrison seeks to draw between alcoholic beverages and

other controlled substances is subject to serious question.

9. AS 04.11.010 provides:
 (a) Except as provided in AS 04.11.020, a person may not manufacture, sell, offer for sale, possess for sale or barter, traffic in, or barter an alcoholic beverage unless under license or permit issued under this title.
 (b) A person may not solicit or receive orders for the delivery of an alcoholic beverage in an area where the results of a local option election have, under AS 04.11.490—04.11.500, prohibited the board from issuing, renewing or transferring one or more types of licenses or permits under this title, unless the person

has two provisions. Section (a) prohibits the sale of alcoholic beverages without a license or permit. Section (b) prohibits the solicitation or receipt of orders for the delivery of alcoholic beverages in local option areas. Importation into local option areas is separately prohibited by AS 04.11.-496(b).[10] Under AS 04.16.200(b)(3), a person convicted under AS 04.11.010(a) or (b) of selling, or of soliciting or receiving orders for alcoholic beverages in a local option area, is guilty of a felony if the quantity of alcohol involved is more than a specified amount. The specified amounts correspond to those in AS 04.16.200(e)(2), the penalty provisions for importation into a local option area in violation of AS 04.11.-496, under which Harrison was convicted.[11] However, one charged under AS 04.11.010 with sale or soliciting or receiving orders in a local option area has an affirmative defense. AS 04.16.200(c) provides:

> It is an affirmative defense to a prosecution under (a) of this section that no profit was involved in the solicitation or receipt of an order for the delivery of an alcoholic beverage.

This defense is not available to one charged with importing alcoholic beverages into a local option area under AS 04.16.200(e). Harrison argues that restriction of the stat-utory defense of lack of profit constitutes a violation of due process.

 We disagree. Harrison was charged with felony importation under AS 04.11.496 and 04.16.200(e) because he brought over forty-five liters of malt beverages into a local option area. The lack of profit defense in AS 04.16.200(c) applies only to misdemeanor prosecutions under AS 04.16.200(a). Thus, the defense is unavailable in a felony prosecution under either AS 04.16.200(b)(3) (sale, or solicitation or receipt of orders in a local option area for large quantities), or AS 04.16.200(e)(2) (importation into a local option area of large quantities). No person charged with a felony under any section of AS 04.16.200 can properly assert the defense of lack of profit. The statute treats all persons charged with felonies alike and, therefore, fairly.

 The affirmative defense of lack of profit might be construed to apply to one charged with the misdemeanor sale of a small quantity of alcoholic beverages in a local option area and not to apply to the misdemeanor importation of the same quantity in a local option area. *See* AS 04.16.200(c) and (e)(1). However, Harrison, as a felon, has no standing to challenge the misdemeanor provisions. In any event, the legislature enacted the local option law to

is licensed under this title and the order is actually received by that person from the purchaser of the alcoholic beverage. A person who violates this subsection is punishable upon conviction under AS 04.16.200(a) or (b).

10. AS 04.11.496(b) provides, in pertinent part:
> If a majority of the voters vote "yes" on the question set out in (a) of this section, a person, beginning on the first day of the month following certification of the results of the election, may not knowingly send, transport, or bring alcoholic beverages into the municipality or established village....

11. AS 04.16.200 states, in pertinent part:
> *Unlicensed persons.* (a) A person who violates AS 04.11.010 is, upon conviction, guilty of a class A misdemeanor.
> (b) A person who violates AS 04.11.010 in an area where the results of a local option election have, under AS 04.11.490–04.11.500, prohibited the board from issuing, renewing, or transferring one or more types of licenses or permits under this title in the area is, upon conviction, guilty of a class C felony, if
> (1) he has previously been convicted of a violation of AS 04.11.010;
> (2) the sale or offer for sale was made to a person under 19 years of age; or
> (3) the quantity of alcoholic beverages sold or offered for sale is 12 liters or more of distilled spirits, 24 liters or more of wine, or 45 liters or more of malt beverages.
> ....
> (e) A person who sends, transports, or brings alcoholic beverages into a municipality or established village in violation of AS 04.11.-496 is, upon conviction,
> (1) guilty of a class A misdemeanor if the quantity imported is less than 12 liters of distilled spirits, 24 liters of wine, or 45 liters or more of malt beverages; or
> (2) guilty of a class C felony if the quantity imported is 12 liters or more of distilled spirits, 24 liters or more of wine, or 45 liters or more of malt beverages.

regulate the importation of alcoholic beverages, not to regulate simple possession. The affirmative defense of lack of profit was meant to be available in cases of casual distribution that occurred as an incident of lawful possession, where the distributor did not unlawfully import the alcoholic beverages in his or her possession. It would not necessarily be irrational for the legislature to refuse to extend the defense to a person who unlawfully imports alcohol into a community that has voted to prohibit both the sale and importation of alcoholic beverages.

## EX POST FACTO LAW

Alaska's local option statute was enacted in 1980. A local option election was held in St. Mary's on September 22, 1981. The community voted to ban importation; the prohibition became effective October 1, 1981. According to § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, Alaska must preclear all changes relating to "voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting." Alaska submitted the local option legislation on April 1, 1982, and obtained conditional clearance on May 17, 1982. Final approval was obtained soon after. When Harrison imported alcohol into St. Mary's on April 16, 1982, the local statute had been submitted but approval had not yet been obtained.

Article I, § 15 of the Alaska Constitution provides, "No bill of attainder or ex post facto law shall be passed." Judge Blair denied Harrison's motion to dismiss the indictment on *ex post facto* grounds, ruling:

There's no argument or finding of any deliberate defiance of the Voting Rights Act; there does not appear to be any discriminatory purpose or effect. The Supreme Court does have three cases that are on point: *Allen v. State Board of Elections*, 393 U.S. 544 [89 S.Ct. 817, 22 L.Ed.2d 1]; *Perkins v. Mathews*, 400 U.S. [379] at 379 [91 S.Ct. 431 at 431, 27 L.Ed.2d 476] and *Berry v. Doles*, 438 U.S. 190 [98 S.Ct. 2692, 57 L.Ed.2d 693].

The Supreme Court has adopted the rule that if the election is precleared by the Justice Department within 30 days of the Court's decision, then the election will not be invalidated. This case didn't have any approval prior to the criminal conduct but we have now had that clearance by the Justice Department. It would appear that the U.S. Supreme Court decisions would indicate that the appropriate—or that it would be inappropriate to declare that the ordinance is not effective and that the election should be invalidated. Accordingly, that motion is denied.

Harrison contends that since the local option statute had not been approved by the federal government when he brought alcoholic beverages into St. Mary's, his conduct was not criminal. In support of his argument, Harrison quotes *Hotch v. United States*, 212 F.2d 280, 284 (9th Cir.1954) (emphasis in original): "a law which has *not* been duly enacted is not a law, and therefore a person who does not comply with its provisions cannot be guilty of any crime." Relying on *Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978), Harrison also contends that election results are invalid and unenforceable until approval is obtained.

■ Harrison's analysis is not persuasive. In *Hotch*, the conviction was overturned because the regulation had not been published, as required by the Federal Register Act and the Administrative Procedure Act. The Federal Register Act expressly provided that a document was not valid until published. The Voting Rights Act, which Harrison claims was violated in this case, does not contain an analogous provision. Thus, the statutory interpretation in *Hotch* is not controlling.

■ In addition, *Berry* does not support Harrison's position. At issue in that case was a 1968 statute that provided for a partial staggering of the terms of three posts of the Peach County Board of Commissioners of Roads and Revenues. Berry unsuccessfully tried to enjoin the 1976 primary election on the ground that § 5 preclearance for the 1968 law had not been

obtained. After the election, a district court enjoined the future enforcement of the 1968 statute until approval was obtained but refused to set aside the election because the electoral changes were "technical" and there was no discriminatory purpose or effect. Berry appealed. The United States Supreme Court remanded the case, holding that the district court should issue an order giving the state thirty days to obtain § 5 approval: "[I]f approval is obtained, the matter will be at an end. If approval is denied, appellants are free to renew to the District Court their request for simultaneous election of all members of the Board at the 1978 general election." *Berry,* 438 U.S. at 193, 98 S.Ct. at 2694, 57 L.Ed.2d at 696. Thus, under *Berry,* the failure to obtain preclearance does not automatically invalidate election results, at least where clearance is ultimately granted. *See also Perkins v. Matthews,* 400 U.S. 379, 396–97, 91 S.Ct. 431, 440–41, 27 L.Ed.2d 476, 489 (1971) (court finds § 5 violation and remands to district court to determine appropriate remedy); *Crowe v. Lucas,* 472 F.Supp. 937, 945 (N.D.Miss. 1979) (registration changes cleared after implementation but prior to election satisfied preclearance requirement of § 5).

▮ The purpose of the Voting Rights Act and the facts of this case also convince us that Judge Blair's ruling was proper. Congress enacted the Voting Rights Act of 1965 to prevent discriminatory practices that exclude minorities from the electoral process. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). As Judge Blair found, there was no allegation of any discriminatory purpose or effect or a deliberate defiance of the Voting Rights Act that may invalidate the election, *Allen v. State Board of Elections,* 393 U.S. 544, 571–72, 89 S.Ct. 817, 834–35, 22 L.Ed.2d 1, 20–21 (1969), and Harrison raises none on appeal. The record contains no indication that Alaska's local option law

or the St. Mary's election were in any way improper under the Voting Rights Act except for the formality of not obtaining preclearance. Nor did Harrison allege any irregularities. In these circumstances, we think Justice Powell's concurrence in *Berry* is particularly apt:

> [W]hen courts are called upon to decide whether to grant retroactive relief, they should distinguish the minor or technical change from the substantive change that is likely to result in discrimination....
>
> It must be remembered that the Voting Rights Act imposes restrictions unique in the history of our country on a limited number of selected States. [Courts] need to bring a measure of common sense to its application....

*Berry,* 438 U.S. at 200–01, 98 S.Ct. at 2697–98, 57 L.Ed.2d at 701 (footnotes omitted).

We do not read the federal cases to hold that the results of an election are invalid or unenforceable until preclearance is obtained. Rather, these cases indicate that where a state has failed to obtain the required preclearance, the election results are subject to invalidation. Mere technical violations of the procedural requirements for preclearance, however, are an insufficient basis for invalidation: a substantive violation, one that could result in denial of preclearance under the act, must be shown. However, "[i]f approval is obtained, the matter will be at an end." *Berry,* 438 U.S. at 193, 98 S.Ct. at 2694, 57 L.Ed.2d at 696.

In the present case, the federal government ultimately approved Alaska's local option law. We hold that the prohibition against the sale and importation of alcoholic beverages into St. Mary's was in effect at the time Harrison brought alcoholic beverages into St. Mary's. Therefore we reject Harrison's claim that his conviction constitutes a violation of the constitutional prohibition against *ex post facto* laws.[12]

---

12. We note Harrison's claim that the enactment of criminal sanctions makes this case different from those cases where the challenged statute merely changed an aspect of the electoral process. However, Harrison has not cited us to any case that makes this distinction or would require us to suspend the enforcement of the St. Mary's local option law while preclearance was pending.

 Harrison argues in the alternative that even if the prohibition was in effect when he brought alcohol into St. Mary's, he was deprived of adequate notice that his conduct was criminal because preclearance for the election had not been obtained. This argument is without merit. Harrison does not allege that he detrimentally relied on a good faith belief that the St. Mary's election had not been precleared and was potentially invalid. In fact, Harrison admitted that he was fully aware of the illegality of his actions. He cannot now claim he lacked notice.

The conviction is AFFIRMED.